CLEMENT et al. v. CITY OF PARIS ·et al.

(Court of Civil Appeals ·of Texas. Texarkana. Jan.· 31, 1913. Rehearing Denied Feb. 27, 1913.)

1. DEEDS (§ 112*)—REFERENCE TO MAP OR PLAN—EFFECT.

A deed conveying land according to a map or plan of a town site, referred to therein, makes the map or plan a part of the deed.

[Ed. Note.—For other cases, see Deeds, Cent, Dig. §§ 323, 324; Dec. Dig. § 112.*]

2. DEDICATION (§ 19*) — CREATION — ESSENTIALS.

Separation by the owner of an entire estate of title to a portion of the property is essential to the creation of an easement, where land is platted as a town site, and the owner conveys part of the ·lots with reference to streets, alleys, and a public square, the ·sub-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

jects of the easements, and retains another part of the lots.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 35, 37–47; Dec. Dig. § 19.*]

3. DEDICATION (§ 19*)—ESSENTIALS—RECORDING OF MAP.

It is not essential to a dedication of streets, alleys, and a public square, according to a town site map, that the map be made or recorded by the owner himself; it being sufficient that he recognize and approve it.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 35, 37–47; Dec. Dig. § 19.*]

4. DEDICATION (§ 15*)—ESSENTIALS—INTENTION.

Intention of an owner to dedicate an essential element of dedication may be expressed by deed or be implied from his acts.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. § 13; Dec. Dig. § 15.*]

5. DEDICATION (§ 46*)—USE.

All dedications for public use are to be considered with reference to the purpose for which the dedication is made, or the use to which the premises may be applied.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. § 89; Dec. Dig. § 46.*]

6. DEDICATION (§ 61*)—PUBLIC SQUARES—USE.

An owner of land platted as a town site conveyed it to county seat commissioners, in trust for the use of the county, reserving certain lots to himself. The town-site plat shows a public square which, at the time of the deed, was intended to be used permanently for county courthouse purposes; the proceeds of the lots sold by the commissioners being also so used. Held, that owners of lots abutting on the square are entitled to enjoin erection by the town of a public comfort station on the square, in lieu of the courthouse which was destroyed, as constituting a use to which the square was not dedicated.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 116, 120; Dec. Dig. § 61.*]

7. INJUNCTION (§ 189*)—SUBJECTS OF RELIEF.

An injunction operates in personam only.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 409; Dec. Dig. § 189.*]

Willson, C. J., dissenting.

Appeal from District Court, Lamar County; T. D. Montrose, Judge.

Action by R. M. Clement and others against the city of Paris and others. Judgment dismissing the suit, and plaintiffs appeal. Reversed and remanded.

Appellants are owners of lots abutting on the streets that surround and front on the "public square" in the city of Paris, and have erected on their property brick and stone business houses. This locality forms now, as it always has, the principal business portion of the city of Paris. The city of Paris, as such, has by ordinance authorized the erection of a substantial, permanent, two-story building, at the cost of the city, in the center of the "public square," to occupy a circle whose diameter shall not exceed 100 feet, and to be known as "Public Comfort Station," for the use, benefit, and enjoyment of the general public, and has further provided, in such ordinance, certain police regulations and penalties respecting the control and use of the building and grounds. The suit

was brought by the appellants in their right of adjacent property owners against the city and the individuals composing the city council to restrain the erection of this building on the public square as being an appropriation by the city as such of the square, and a perversion of the premises to purposes and uses entirely different from, and inconsistent with, the purpose and use to which it was dedicated, and the purpose and use contemplated in its dedication and heretofore continuously observed since its dedication, and tending to their injury. The defendants filed exceptions and answer to the petition. The court sustained all the exceptions but two, and treating the exceptions as amounting to a general demurrer, upon plaintiffs declining to amend, dismissed the suit.

Burdett & Connor, Moore & Park, and Long & Wortham, all of Paris, for appellants. Wright & Patrick, of Paris, for appellees.

LEVY, J. (after stating the facts as above). By treating the ruling of the court as sustaining a general demurrer to the petition, as was the conceded effect of the ruling, we may proceed at once to consider the controlling facts of the case as the petition discloses them, and give the proper legal effect thereto. Lamar county was organized in 1841. In order to give the proper legal effect to the acts of the parties, the act of Congress of the republic of Texas of 1842, and the supplementary act thereto of 1844 (2 Gammel's Laws, pp. 823, 918), must be held, as properly argued by appellees' counsel, to have been incorporated in the petition. By reference to the act itself it is seen that the several persons therein constituted as commissioners were specially appointed and empowered to ascertain the geographical center of Lamar county and nominate two or more points, having regard to donations of land for the purpose, within three miles of the center so ascertained, that the qualified voters of the county, at a special election to be ordered by the said named commissioners, might make selection therefrom of the site for the location of the county seat, and, after the election, to give a name to the place receiving the highest number of qualified votes. The act in terms further provided that the place receiving the highest number of qualified votes at the election should be declared and be the county seat of Lamar county, and empowered the commissioners named to proceed to lay out a town on the premises so chosen by the voters, sell lots, contract for public buildings, and do all things necessary for the promotion of the interests of the county. The purpose of the act, as seen, was in furtherance of public purposes in locating the county seat of Lamar county, and to accomplish the erection of the necessary public buildings for governmental uses and purposes through the sale of lots given to the people

for the purpose. The commissioners were not capacitated to make the selection of the county seat. The right to select a place for the location from the places nominated by the commissioners was in the qualified voters of the county. By requiring the commissioners to proceed to lay out a town and sell the lots after the selection of the place offered to be donated was made by the voters, it was clearly intended, as necessarily involved, to confer the power upon the commissioners to take and accept the offered donation from the owner in order to legally accomplish the purposes of the donation. It was manifestly contemplated by the passage of the act that there was to be a free gift of the premises to the people to accomplish the purposes to locate a county seat thereon and furnish a way, by proceeds arising from the sale of the lots, for erecting the necessary county buildings. It is apparent that it was so understood by the voters, G. W. Wright, and the commissioners.

It appears from the petition that, at the date of the act, G. W. Wright was a citizen of Lamar county, and was the owner of the Larkin Rattan headright survey, and that he was desirous of having the county seat located and remain on a part of his premises. It can be said from the petition, and from the recitals in the exhibits made a part of the petition, that G. W. Wright made offer to the commissioners to make donation, for the use and benefit of Lamar county, in the location of the county seat, of premises embracing 50 acres of his survey, less a reserve portion thereof when laid out into a town site, and that the commissioners, as was their duty, nominated it as one of the places to be voted on by the voters at the election. It can further be said that, at the special election held for the purpose, the donation offered to be made by G. W. Wright was selected by the voters of Lamar county. The result of the election operated, by the terms of the act, as fixing and locating the county seat upon the premises so offered to be donated by G. W. Wright when the actual donation by the owner was effected. After the election, it remained as the duty of the commissioners, and it appears that they did do so, to proceed to lay off a town site on the 50 acres offered to be donated by G. W. Wright, and they named it "Paris." A map or plat of the town was made at the time of its laying off, which is made a part of the petition; and there appear thereon regularly laid off and numbered blocks, subdivided into lots, and streets, and alleys, and an open unnumbered block the size of the other blocks, which was 216 feet square, marked "public square." It appears that the commissioners as such made the map, with the understanding and agreement with G. W. Wright, as alleged, that the square so marked "public square" was designed and meant to include and indicate the reservation of the right for the county courthouse to be located

thereon in the public uses to be made of the square. After the commissioners laid out the town site on the 50 acres, and on August 24, 1844, G. W. Wright executed a bond for title, which is made a part of the petition. The bond evidences the intention to carry into effect G. W. Wright's offer and purpose to make donation of certain premises embraced in 50 acres of his survey, for the use and benefit of Lamar county in locating a county seat. The bond obligates G. W. Wright to make title to the commissioners, as such, appointed by the act of January 3, 1844, describing them as "commissioners for the purpose of locating the seat of justice of Lamar county," when he receives a patent from the government to the survey. The consideration recited is the donation or gift for the use and benefit of Lamar county of the certain described premises designated as the ground on which "the said commissioners have laid off a town site under the name of Paris," upon the "condition" or purpose of having the seat of justice of Lamar county located and remain on the land. The premises are described therein with reference to and by calls for lots and blocks "in the plan of the town of Paris," and there are expressly reserved to the donor "lots No. 1 in block No. 1, and Nos. 2 and 4 in block No. 3."

Later, and on November 24, 1847, G. W. Wright executed a conveyance to the same commissioners named in the bond for title, which conveyance is made a part of the petition. This instrument recites that it is made "in consideration of stipulations heretofore." Construing, as we do, the "stipulations heretofore" as meaning and referring to the bond for title, then the consideration is a donation or gift of a portion of the premises to the use and benefit of Lamar county for the purpose of having the seat of justice of Lamar county located and remain on a particular part of the premises. The conveyance designates the premises as "all that certain tract or parcel of land situated in Lamar county, and on which the town of Paris is located." and is described, as in the bond, with reference to and making calls for certain blocks and lots "on the plan of the town of Paris." There are expressly reserved, to the donor's own use and benefit, the same "lots" set out in the bond. The habendum clause in the instrument provides that the commissioners as such, or, in case of their death or inability to act, their successors in office, are to have and hold "the balance" of the above-described premises "so as to enable them to pass titles to the purchasers of the lots in trust for the use and benefit of Lamar county."

[1] As both the bond for title and the deed of donation or gift refer to and pass the premises according to the map or plan of the town of Paris, in legal construction the map or plan becomes a part of the deed, as within the intention and purpose of the parties. The map or plan is made a part of the petition, and is alleged to be the map

or plan referred to in the instruments. After the execution of the bond for title, the commissioners, it appears, proceeded to sell the lots, after public advertisement, for the purpose of raising funds to erect a courthouse, and at the sale exhibited the map, and there announced that the block laid off as a "public square" was for the benefit of the public for courthouse purposes, and was so dedicated; and after the sale the commissioners had the map placed of record in the deed records of the county. The county courthouse was erected on this square in 1844 with the proceeds of the sale of the lots, and it continually remained there until 1877, when it was burned down. The bond is evidence to show that, before Wright undertook to make the actual·donation, he and the commissioners, by laying out a town site and making a plat or map thereof, were looking to a future use and enjoyment of the premises, according to the arrangement of the map or plat. Wright was not donating the entire premises, but was continuing as the owner of a portion. Both Wright and the commissioners, it must be said, had in contemplation the "selling of the lots" in subsequent purchasers thereof, and the location of a courthouse as well. There was a mutual advantage in having the arrangement of lots, blocks, and streets. By obligating himself to make actual donation or gift of the greater portion of the premises, and himself retaining a portion according to the subdivision and arrangement on the plat or map, there is evident the knowledge and consent of Wright that it be so done, and the intention and purpose on Wright's part to adopt the existing arrangement of the premises on the plat or map, and with the design to create and make permanent the arrangement according to the plat or map. By the commissioners' accepting the actual donation of the greater portion of the premises, and by Wright retaining a portion to himself according to the designed and arranged plan, there were implied mutual agreements that the plant, as arranged, should ever remain as arranged. In legal effect, the right of Wright thereafter to change the arrangement ceased. The parties must be presumed, therefore, to have acted with reference to the mutual arrangement of the property at the time of the donation deed.

[2] There is thus presented proof of the essentials to the creation of an easement. There is a separation by the owner of the entire estate of title to a portion of the property; and, before the separation occurs, a mutual arrangement of a plan of subdivision into lots, blocks, alleys, streets, and a square, meant and designed to be permanent, which mutual arrangement is necessary and beneficial to the portion conveyed and the portion retained by the owner. This is one of the recognized modes by which an ease-ment or servitude is created. Oswald v. Grenet, 22 Tex. 94; Preston v. City of Navasota, 34 Tex. 684; Lamar County v. Clements, 49 Tex. 347; Sanborn v. Amarillo, 42 Tex. Civ. App. 115, 93 S. W. 473; 2 Abbott on Municipal Corporations, § 730; Jones on Easements, § 231.

[3] It is not essential to the dedication that the owner of the land himself make the map if he, as here, recognized and approved the map. Nor is it essential to a common-law dedication, as here, that the map be placed of record by the owner himself.

[4] The vital principle, as seen from the authorities, upon which the doctrine of dedication rests is the intention of the owner to dedicate; and the intention may be expressed by a deed, or it may be implied from the acts of the owner of the land, coupled with the intention with which he did the acts. The authorities above are clear that the series of acts by the owner, such as causing a subdivision into blocks and streets and squares, and causing to be made or approving a map made by others, and passing titles to a portion of the lots in accordance with the plan, has the legal effect of conclusively evincing the owner's intention of making an irrevocable dedication of the streets, alleys, and square. The same principle and quantum and kind of evidence of intention applicable to dedication of public streets is applicable to squares and parks. Archer v. Salinas City, 93 Cal. 43, 28 Pac. 839, 16 L. R. A. 145.

[5, 6] It is a further universal rule that all dedications for public use.are to be considered with reference to the purpose for which the dedication is made, or the use to which the premises may be applied. In the light of the intention of Wright to make dedication according to the plan or map, the purposes and intent of the parties in passing title by the deed of donation or gift must be ascertained so as to effectuate such intention and common purpose. By precise words of the deed, there was granted to the donee the title to certain premises "on which the town of Paris is located," and as bounded and described with reference "to the plat of the town of Paris"; and he was to have and to hold the premises "so as to enable the commissioners to pass titles to the purchasers of the lots in trust for the use and benefit of the county." If the reference in the bond and the deed to the plan of the town be taken to have been for the purpose of boundary and description of the premises title was undertaken to be passed to, and such is in legal construction the effect, the deed operated to give the commissioners the full title to the lots designated on the plan, except the reserved ones, but not the title to the streets, alleys, and square delineated on the map or plan.

Looking to the habendum .clause of the

deed, the motive of the donor is clear be-. yond doubt, and consistent with the granting clause that the donee was to have fee-simple title "to the lots," and not the streets, alleys, and square, so that "the lots" could be sold to raise funds to erect a courthouse. From the very nature of the subject-matter, it is evident that the location of a courthouse on one of the. blocks, and the means to raise funds to build a courthouse by selling all the other lots, formed the principal incident of the donation. It is not doubted that a county can only acquire and hold property for necessary public purposes and for the benefit of all its citizens, and that this was the object here, as shown by the intention of the donation deed. Manifestly the whole town site, as laid out, was not intended to be passed, nor did it pass, by the deed. The right the county acquired in the square was an easement. We are of the opinion that the proper legal effect to be given to the alleged facts is that the marking of "public square" on the block in suit, on the original map of the town of Paris at the time of its founding, was designed and meant by G. W. Wright and the commissioners as a dedication of the block to the public as a "public square," with the reserved right of erecting a county courthouse upon it as one of the uses, and that it was intended to be so dedicated by G. W. Wright, and so accepted by the commissioners on behalf of the public. Being a dedication by intention and purpose as a "public square" and with reserved rights for courthouse purposes, it could not be used for any other or different purpose inconsistent with the use intended. See Llano v. Llano County, 5 Tex. Civ. App. 132, 23 S. W. 1008. Especially the city, as such, could not erect any building thereon. The dedication, as against the owner, being irrevocable, then after the removal of the courthouse here by Lamar county, as it had the legal right to do, the uses that the square could legally be put to would be such uses as a square would ordinarily be put to by the public.

In the case of Llano v. Llano County, supra, the statement is made: "It is said, and we think justly so, that public squares, so far as the uses of the property are concerned (except where a right is reserved in dedicating it), are placed in the same category as public highways [citing cases], and that the public have the right to the use and enjoyment of such highways to the extent of their entire length and width. It is a right in the concrete."

In the reported cases, which are numerous, it has been uniformly held that the proprietor who had sold lots with reference to a plat or map of the town with a block marked "public square" was estopped to deny that such square had been dedicated to the public. These decisions rest upon the theory that, by marking the word "public" thereon, there is implied the representation to the purchasers of lots that such square had been dedicated to the public. If the one act of the owner in so marking the block on the map could be looked to as operating and having the effect to conclusively show to purchasers of the abutting lots the intention of the owner to dedicate to the public use, then the entire marking and arrangement of the map could be further looked to as an act of the owner operating and having the effect of fairly and reasonably indicating and representing to such purchasers that the particular square—open, undivided, unnumbered, and situated as it was—was designed for use by the general public purely and exclusively, as in the nature of a highway or plaza. The block appears in the center of the town site, not divided into building lots like all the others, but left open and entirely surrounded by streets. All the other blocks were subdivided into lots, indicating their use as building lots. So, taking the allegations of the petition as true, and by following the adjudicated cases, as we feel constrained to do, we have a case of diversion of use of the public square by the city, as such, if the building is erected, inflicting a private injury, as decided by the cases, upon the owners of abutting property which should be restrained by injunction; and the court erred in sustaining a general demurrer.

[7] We think no right could be here predicated by appellants on the second count in the petition, and the court committed no error in that respect, for the reason that an injunction only operates in personam.

The case is reversed and remanded.

WILLSON, C. J. For reasons indicated in the brief statement following, I do not agree that the judgment should be reversed.

It appearing from the allegations in the petition that the county had permanently abandoned the use of the square as a site for its courthouse, the allegations as to the understanding between Wright and the commissioners, and as to representations made by the commissioners to purchasers of lots delineated on the plat, should not be given effect in determining whether the demurrer should have been sustained or not. When such abandonment occurred, the dedication stood as one made to the public, without a reservation of any kind by the dedicator. Therefore the question in the case simply was one as to the effect which should have been given the words "public square" written on the plat by the dedicator, made a part of the petition. I think those words should be construed as showing the intent of the dedicator to be to devote the square to any lawful use the public might choose to make of it, not inconsistent with the use it was contemplat-

ed purchasers of the lots delineated on the map might make of such lots.

The conclusion reached by a majority of the court that, after the use thereof as a site for the courthouse had been abandoned, the square must be maintained as an open space, it seems to me, is not warranted by the fact that it was so delineated on the plat. The dedicator could not have used words which would have indicated more clearly, than did those used, an intention on his part to. devote the square to any use the public might choose to make of it. The intention so indicated, it seems to me, ought not to be held to be defeated by his failure to define "public uses" on the map. Such a definition, if not broad enough to include every public use, might itself have operated to defeat his intention to devote the land to unrestricted use by the public, because it would have been construed as excluding every public use not within the definition. Therefore I do not think the intention of the dedicator, so clearly evidenced by the words he used, should be held to be controlled by the fact that the square appeared on the plat as an open space. The effect of so representing the square on the map, a majority of the court holds, is to devote it to use by the public as a street or highway only. That the dedicator did not contemplate such restricted use of the square is shown by the fact that he dedicated land for use as streets exclusively on all sides of it. That neither the dedicator nor any of the parties concerned expected that the entire square ever would be used for street purposes alone is shown by the fact, as alleged in the petition, that they contemplated that a courthouse would be built and maintained thereon. If the conclusion reached by the majority of the court is correct, after the county abandoned the use, as such, of the courthouse it constructed on the square, it could not have devoted it to any other public use, but, at the suit of the plaintiffs, could have been compelled to tear down and remove it from the square. Instead, I think, under such circumstances, the county should be held to have had a right, if it chose to do so, to devote the abandoned courthouse to the use of the public as a "rest room," or to any other use not inconsistent with the use it was contemplated the purchasers of the lots would make of the lots. In determining the intention of the dedicator, I think it should be borne in mind that he was devoting his property to permanent, and not to temporary, public use, and must have comtemplated that a time might come when the public would wish to make other uses than were then made of such squares. If he contemplated such a time might come, and wished to make his dedication broad enough to meet the wishes of the public, I think he could not have chosen words more effective to do so than those he chose.